# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br>RICHARD MAJHOR, )<br> )<br>           Plaintiff )<br> )<br>   v. )<br> )<br>DIRK KEMPTHORNE, et al. )<br> )<br>      Defendants. )<br> )<br>_____ ) | Civil Action No. 07-1465 (RBW) |

## MEMORANDUM OPINION

Richard Majhor, a United States citizen currently incarcerated at the Tafuna Correctional Facility in Pago Pago, American Samoa and the plaintiff in this civil suit, seeks declaratory and injunctive relief as well as compensatory and punitive damages against numerous defendants for their alleged "deliberate indifference and intentional, knowing, reckless and/or negligent deprivation of medical care and treatment to [the p]laintiff," Amended Verified Complaint for Injunction, Declaratory Judgment and Damages ¶ 2 (the "Amended Complaint" or "Am. Compl."), "in violation of rights guaranteed to him by the United States Constitution and 42 U.S.C. [§] 1983 [2000], inter alia," id. ¶ 45.[1]  Currently before the Court is the plaintiff's

_____

[1]  The named defendants are Dirk Kempthorne, Secretary of the United States Department of Interior (the "Secretary"); American Samoa government officials Togiola T. Tulafono, Fepuleai Afa Ripley, Jr., Mark R. Hales, Sotoa M. Savali, and Fuega Saite Moliga (collectively the "American Samoa Defendants"); and the LBJ Tropical Medical Center (the "LBJ Center") along with its officers and employees Charles Warren, Patricial Tindall, Annie Fuavai, M.D., Terry Lovelace, and John Does 1-50 (collectively the "LBJ Center Defendants").

Renewed Motion for Preliminary Injunction.  After carefully considering the parties' pleadings,[2]

the plaintiff's renewed motion, and all memoranda and exhibits relevant thereto,[3] the Court

concludes that it must deny the plaintiff's renewed motion.

## I. Background

The plaintiff is a "citizen of the United States who is and has been residing temporarily in

the United States Territory of American Samoa at all times pertinent" to this case.  Am. Compl.

¶ 5.[4]  "American Samoa is an unincorporated territory of the United States consisting of a cluster

of small islands in the South Pacific."  King v. Morton, 520 F.2d 1140, 1142 (D.C. Cir. 1975).

The territory is governed by a constitution, which creates three independent branches of

government (executive, legislative, and judicial) and contains a Bill of Rights.  Rev. Const. Am.

Samoa Art. I-V.

---

[2]  Three pleadings are on the Court's docket at this time: the Amended Complaint, the Answer and Affirmative Defenses filed by the defendants Mark R. Hales, Fepuleai Afa Ripley, Jr., Togiola T. Tulafono, Sotoa M. Savali, and Fuega Saite Moliga (the "Am. Samoa Answer"), and the Answer and Affirmative Defenses of Charles Warren, Patricia Tindall, Annie Fuavai, Terry Lovelace, and the LBJ Tropical Medical Center (the "LBJ Center Answer").  The Secretary has not yet filed an answer.

[3]  In addition to the pleadings referenced above, see n.2, supra, the Court has considered (1) the plaintiff's Memorandum of Law in support of his motion (the "Pl. Mem.") along with the Affidavit of Eric A. Seitz filed in support of the plaintiff's motion (the "Seitz Aff.") and Exhibits A-L thereto; (2) the Secretary's Response to Order to Show Cause, Opposition to Plaintiff's Motion for Preliminary Injunction[,] and Motion to Dismiss (the "Sec'y Opp'n"); (3) the Def[e]ndant's Response to Plaintiff's Renewed Motion for Preliminary Injunction and the Court's Order to Show Cause filed by the American Samoa Defendants (the "Am. Samoa Opp'n"); and (4) the Affidavit of Eric A. Seitz in Response to Defendants' Pleadings and Exhibits (the "Seitz Response Aff.").  The Court also considered the Motion for San[c]tions Pursuant to Rule 11 filed by the American Samoa Defendants (the "Am. Samoa Sanctions Mot.") along with the Affidavit of Mark R. Hales (the "Hales Aff.") and Exhibits A-C thereto, the Def[e]ndant's Motion to be Removed as a Defendant filed by Hales (the "Hales Mot."), the Motion for Sanctions Pursuant to Rule 11 filed by the LBJ Defendants, and the Def[e]ndant's Second Motion to be Removed as a Defendant Because of His Departure from the Attorney's General Office filed by Hales (the "Second Hales Mot.") insofar as these motions and their attachments could be construed as memoranda of law and exhibits in opposition to the plaintiff's renewed motion.

[4]  Except where otherwise noted, all allegations made by the plaintiff in his Amended Complaint cited herein are admitted by those defendants that have filed answers.

The executive branch of the American Samoa government consists of a governor and lieutenant governor, both of whom are popularly elected. Id. at Art. IV § 2. The judicial branch consists of a High Court, District Courts, and "such other courts as may from time to time be created by law." Id. at Art. III § 1. Decisions by the High Court can be appealed to an appellate division made up of the chief justice of the High Court, the associate chief justice, acting associate judges, and associate judges. Am. Samoa Code § 3.0220 (1981). The High Court is considered a "territorial court" under Article IV of the United States Constitution. See Meaamaile v. American Samoa, 550 F. Supp. 1227, 1235 (D. Haw. 1982) ("[t]he courts established for American Samoa are not Article III courts, but, rather, legislative courts" (emphasis in original)).

On February 16, 2006, the plaintiff was convicted by the High Court of murder in the first degree, felonious restraint, tampering with physical evidence, and property damage in the first degree. Am. Compl. ¶ 19. He was sentenced to life imprisonment for his first-degree murder conviction, seven years for his felonious restraint conviction to run concurrently with his life sentence, and terms of five years on each of his convictions for tampering with physical evidence and property damage to run concurrently with each other and consecutive to the plaintiff's other prison terms on May 18, 2006. Id. ¶ 20. The plaintiff's convictions are currently on appeal to the appellate division of the High Court. Id. ¶ 21.

The plaintiff asserts that, beginning on February 22, 2007, he has suffered "fainting episodes during which he has suffered loss of consciousness and physical injuries to his head." Id. ¶ 22. He claims that in March of 2007, he was treated by the former director of and staff physician at the LBJ Center, Dr. Iotamo T. Saleapaga, "who recommended that [the p]laintiff be

3

provided neurological and cardiac evaluations that are not capable of being performed at [the] LBJ Center or elsewhere in American Samoa." Id. ¶ 25.  Specifically, the plaintiff asserts that Dr. Saleapaga "recommended that [the p]laintiff receive neurological evaluations to include EEG, MRI[,] and [a]ngiograthy procedures, and cardiology evaluations that may include echocardiogram, Holter monitor and cardiac cathe[ter]ization procedures." Id. ¶ 28.  Dr. Saleapaga memorialized his recommendations in a letter dated June 13, 2007.  Id. ¶ 27; Seitz Aff. ¶ 5, Ex. A (Letter from Dr. Iotamo T. Saleapaga to Unnamed Recipient (June 13, 2007) (the "Saleapaga Letter")).

       In support of the plaintiff's motion for a preliminary injunction, his attorney states that his office "immediately informed [d]efendant Mark R. Hales and representatives of the Attorney General and the Governor of American Samoa . . . about Dr. Saleapaga's recommendations." Seitz Aff. ¶ 4.  When that approach to have the recommendations implemented proved unsuccessful, the plaintiff filed a motion for his emergency release with the High Court, id., Ex. B (Defendant-Appellant's Motion for Emergency Release, filed June 23, 2007), so that he could "travel directly to Hayward, California, and reside with his mother, Vicki Majhor," where he could receive the medical evaluations recommended by Dr. Saleapaga, id., Ex. B at Ex. 1 (Affidavit of Eric A. Seitz (the "Seitz Emergency Motion Affidavit")) ¶ 5(a).  Following a hearing on the plaintiff's emergency motion on July 12, 2007, the plaintiff's attorney met with Fepuleaì Afa Ripley, the Attorney General for American Samoa, and "two of his deputies," Seitz Aff. ¶ 8, at the direction of the High Court, id. ¶ 7 & Ex. C at 2 (Follow-Up Order on Defendant's Medical Condition Determination (the "High Court Order")), after which the plaintiff's attorney "believed that these representatives understood the urgency of [the p]laintiff's

4

situation," Seitz Aff. ¶ 8.  The very next day, on July 13, 2007, the High Court directed Ripley

"to oversee a complete and thorough investigation into [the d]efendant's present medical

condition and needs for medical attention and treatment in order to properly determine whether

or not [the p]laintiff . . . must arrange to provide [the d]efendant with necessary medical care

outside of the Territory of American Samoa."  High Court Order at 2.

      The plaintiff's attorney further states that he requested assistance in effecting the transfer

of the plaintiff from Terry Lovelace, general counsel for the LBJ Center, via facsimile

communication on July 14, 2007, Seitz Aff. ¶ 9 & Ex. D (Facsimile from Eric A. Seitz, Esq. to

Terry Lovelace, Esq. (July 14, 2007)), and again on July 23, 2007, id.  ¶ 11 & Ex. E (Facsimile

from Eric A. Seitz, Esq. to Terry Lovelace, Esq. (July 23, 2007)), without success, id. ¶ 12.  After

receiving a reply facsimile from Lovelace on July 24, 2007, in which Lovelace declined to

discuss the plaintiff's medical condition but volunteered to "discuss LBJ Tropical Medical

Center's Policy and Procedure for [O]ff-Island referrals," id., Ex. F (Facsimile from Terry

Lovelace, Esq. to Eric A. Seitz, Esq. (July 24, 2007)), the plaintiff's attorney states that he sent a

lengthy facsimile to Togiola Tulafono, the Governor of American Samoa, Seitz Aff. ¶ 13, in

which he threatened to bring "a civil legal action in the United States District Court in

Washington, D.C.," id., Ex. G (Facsimile from Eric A. Seitz, Esq. to the Honorable Togiola T.

Tulafono (July 27, 2007)), for "not only injunctive relief but also general and punitive damages

for the violations of [the plaintiff's] constitutional rights," id.  The plaintiff's attorney claims that

he sent another letter by facsimile that same day to Dr. Annie Fuavai, the chair of the Off-Island

Referral Committee at the LBJ Center, in which he requested that the committee consider the

plaintiff's request "on an expedited basis."  Seitz Aff. ¶ 14 & Ex. H (Facsimile from Eric A.

Seitz, Esq. to Dr. Annie Fuavai, Off-Island Referral Committee Chair, LBJ Tropical Medical

Center (July 27, 2007)).

Sometime around August 10, 2007, the plaintiff's attorney conferred with Mark Hales, at

that time an Assistant Attorney General for American Samoa, about a possible transfer for the

plaintiff from American Samoa to Hawaii.  Seitz Aff. ¶ 18; Hales Aff. ¶ 12.[5]  According to the

plaintiff's attorney, Hales indicated that Hawaii corrections officials were willing to house the

plaintiff "contingent upon the necessary payment of expenses associated with the transfer and

care that he would be provided in Hawaii," Seitz Aff. ¶ 19, and that "the process might be

expedited" if the plaintiff would "pay for some of the transportation and medical costs," id. ¶ 20.

Hales remembers this exchange somewhat differently: according to him, Seitz was told "that if

the [p]laintiff was approved by the Off[-]Island Referral [Committee], the American Samoa

Government would pay for all those costs," but that "if the [p]laintiff was not approved, the

[p]laintiff would have to pay for all additional costs."  Hales Aff. ¶ 12.  Hales represents that he

then added that "if the [p]laintiff wanted to pay for his off[-]island care now, he could leave as

soon as transportation arrangement[s] could be made."  Id.

The plaintiff's attorney states that he has been "informed that [the p]laintiff has continued

to suffer fainting episodes and loss of consciousness" since the attorney's last conversation with

Hales, Seitz Aff. ¶ 22, and further avers that the plaintiff "now is being denied his previously

prescribed pain medications for pre-existing migraine and other neurological treatments in

response to [the plaintiff's] efforts to ensure that [he] receives the basic medical care and

---

[5] Hales has since resigned his post and represented that he "will be leaving American Samoa on October 21, 2007, and moving to Sandy, Utah."  Second Hales Mot. at 3.

treatment to which he is entitled under the United States Constitution," id. ¶ 23.  Hales asserts

that he has maintained regular contact with Lovelace, general counsel for the LBJ Center, since

his August 10 conversation with the plaintiff's attorney.  Hales Aff. ¶ 13.  As told by Hales,

"Lovelace . . . informed [the plaintiff's attorney] that [the plaintiff] has not properly applied to

the Off[-]Island Referral Committee and needed to [do so] before any assessment could be

made," but "that the [p]laintiff ha[d] still not properly applied to the Off[-]Island Referral

Committee for medical assistance" as of September 25, 2007.  Id.

      The plaintiff initiated this lawsuit on August 13, 2007, for damages, declaratory and

injunctive relief, and a writ of habeas corpus based on the defendants' alleged failure to provide

necessary medical care and treatment to him.  The plaintiff also filed a request for a temporary

restraining order and a motion for a preliminary injunction pursuant to Federal Rule of Civil

Procedure 65.  On August 24, 2007, the court entered an order denying the plaintiff's request for

a temporary restraining order and motion for a preliminary injunction and dismissed the

plaintiff's habeas petition and complaint without prejudice sua sponte (the "Dismissal Order").

      The plaintiff moved for reconsideration of the Dismissal Order under Federal Rule of

Civil Procedure 59(e) on August 26, 2007.  After carefully considering the arguments made in

the plaintiff's motion for reconsideration, the Court entered an order on August 29, 2007,

granting in part and denying in part the plaintiff's motion for reconsideration (the

"Reconsideration Order").  In its Reconsideration Order, the Court reinstated the plaintiff's non-

habeas claims except insofar as the claims sought the plaintiff's release from incarceration based

upon the reinstated claims.  Reconsideration Order at 7.  The Court also granted the plaintiff

leave to file a renewed motion for a preliminary injunction, but denied his request to re-petition

for a temporary restraining order.  Id. at 7-8.  In response to the Reconsideration Order, the plaintiff filed his Amended Complaint and his Renewed Motion for Preliminary Injunction on August 30, 2007.

The plaintiff argues that the defendants' conduct violates the Eighth Amendment's ban on "cruel and unusual" treatment and that he is "entitled to preliminary injunctive relief because his likelihood of success on the merits" of his § 1983 claim "is substantial."  Pl. Mem. at 10-15.  The plaintiff further contends that "the likelihood is great that [the p]laintiff will suffer irreparable injury, and perhaps even death, as a result of [the d]efendants' continued and deliberate indifference."  Id. at 15-16.  Injunctive relief is necessary at this stage in the case, he asserts, to "protect the rights, interests, and well-being of [the p]laintiff such that [the p]laintiff will be free from imminent injury and harm due to the failure of [the d]efendants to act . . . ."  Id. at 16.

The defendants contend that the plaintiff's assertions that he has been denied medical care improperly are baseless, see Sec'y Opp'n at 9 ("there are no allegations from which it can be inferred that [the Secretary] was personally involved [in], or was even aware of, illegal conduct"); Am. Samoa Opp'n at 8-9 ("The [p]laintiff is provided weekly treatment at LBJ Tropical Medical Center, and at other times as necessary."); Hales Mot. at 3-6 ("Hales has aggressively sought assistance in providing off[-]island medical care."), and assert numerous jurisdictional defenses to the plaintiff's lawsuit, including, inter alia, sovereign immunity, Sec'y Opp'n at 8-9, failure to exhaust territorial remedies, id. at 7; Am. Samoa Opp'n at 5-8, lack of venue, Am. Samoa Opp'n at 4-5, and absolute immunity from suit under § 1983, id. at 10; Hales Mot. at 6-7.  Both the Secretary and the American Samoa Defendants also contend that the plaintiff will suffer no irreparable injury if preliminary injunctive relief is denied.  See Sec'y

8

Opp'n at 10-11 ("there is no risk of immediate irreparable harm should the preliminary

injunction not issue as to the federal defendant"); Am. Samoa Opp'n at 9-10 ("The [p]laintiff's

[m]otion for [an] injunction should also be denied because the [p]laintiff is not threatened with

any serious medical risks.").  The Secretary notes that "independent medical evidence does not

support [the plaintiff's] claim of urgency," Sec'y Opp'n at 10, while the American Samoa

Defendants point out that "[t]hirteen separate doctors have treated the [p]laintiff[,] and all

thirteen have not believed that he was a candidate to be referred to the Off-Island Referral

Committee because the [p]laintiff's medical condition was not serious or life threatening," Am.

Samoa Opp'n at 10.

        The plaintiff has provided no response to the legal arguments made by the defendants.

Instead, his attorney asserts in an additional affidavit that "from the medical records and

information produced by the [d]efendants[] themselves, it appears that over a period of several

months corrections officials repeatedly determined that [the plaintiff] was in need of medical

treatment," Seitz Reply Aff. ¶ 5, that "when this lawsuit was filed, LBJ Tropical Medical Center

terminated all care and medications for [the plaintiff] and has refused to see or treat him further,"

id. ¶ 5, and that the defendants "do not deny that [the plaintiff] requires all of the tests originally

recommended by Dr. Saleopaga," id. ¶ 7.  The plaintiff's attorney therefore contends that "it is

evident from [the defendants'] pleadings that they have failed and refused to provide [the

plaintiff] with the medical treatment and care that he requires." Id. ¶ 16.  Under such

circumstances, he posits that "there is no available remedy to seek that care for him other than by

[the plaintiff's] current application to this Court for injunctive relief." Id.

**II. Standard of Review**

A preliminary injunction "is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation and citation omitted). In deciding whether to grant preliminary injunctive relief, the Court "must examine whether (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction." Ellipso, Inc. v. Mann, 480 F.3d 1153, 1157 (D.C. Cir. 2007) (internal quotation and citation omitted). The Court "must balance these factors, and if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." Id. (internal quotation and citation omitted). "Despite this flexibility, though, a movant must demonstrate at least some injury for a preliminary injunction to issue, . . . for 'the basis of injunctive relief in the federal courts has always been irreparable harm.'" Chaplaincy of Full Gospel Churches, 454 F.3d at 297 (quoting Sampson v. Murray, 415 U.S. 61, 88 (1974) (quotation omitted)) (further internal quotation omitted).

"A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." Id. (citation omitted). Nevertheless, even if a district court concludes that a party seeking preliminary injunctive relief cannot demonstrate irreparable injury, the District of Columbia Circuit has instructed that it should address all of the factors set forth above because "[i]t is of the highest importance to a proper review of the action of a court in granting or refusing a

10

preliminary injunction that there should be fair compliance with [Federal Rule of Civil Procedure 52].” Id. at 304-05.  This rule requires a court considering an application for preliminary injunctive relief to “set forth the findings of fact and conclusions of law which constitute the grounds of its action.”  Fed. R. Civ. P. 52(a).

### III. Legal Analysis

Pursuant to Rule 52(a), this Court must assess the merit of the plaintiff’s request for preliminary injunctive relief with respect to each of the factors delineated by the District of Columbia Circuit.  As set forth more fully below, the Court concludes that each of these factors weighs against the entry of a preliminary injunction against the defendants.  The plaintiff’s renewed motion must therefore be denied.

A.    Likelihood of Success on the Merits

“It is particularly important for the movant to demonstrate a substantial likelihood of success on the merits,” Hubbard v. United States, 496 F. Supp. 2d 194, 198 (D.D.C. 2007) (citation omitted), for “absent a substantial indication of likely success on the merits, there would be no justification for the [C]ourt’s intrusion into the ordinary processes of administration and judicial review,” id. (internal quotation and citation omitted).  The plaintiff argues that such an “intrusion” is warranted in this case because the defendants have violated his Eighth Amendment right to be free from “cruel and unusual” punishment by denying him access to necessary medical care.  Pl. Mem. at 10-15.  Citing Farmer v. Brennan, 511 U.S. 825 (1994), and Anderson-Bey v. District of Columbia, 466 F. Supp. 2d 51 (D.D.C. 2006), he argues that “the failure of [the d]efendants to provide basic medical evaluations is ‘sufficiently serious’ to expose [the p]laintiff to ‘substantial risk[s] of harm,’” Pl. Mem. at 11 (citing Anderson-Bey, 466 F. Supp. 2d at 61

11

(quoting <u>Farmer</u>, 511 U.S. at 834)), and that the defendants "clearly have acted with 'deliberate indifference' to [the p]laintiff's health and safety," <u>id.</u> at 12, thus violating his rights under the Eighth Amendment.

The defendants argue that the plaintiff cannot succeed on the merits of his Eighth Amendment claim for numerous reasons.  The Secretary argues that the Court lacks subject-matter jurisdiction to hear this case, Sec'y Opp'n at 6, that "the controversy is not ripe" because the plaintiff "is required to exhaust his local remedies before proceeding in federal court," <u>id.</u> at 7, that the plaintiff's claim should be dismissed against him pursuant to Federal Rule of Civil Procedure 19 if the other defendants in this case "cannot be made parties due to lack of personal jurisdiction, improper venue, or lack of subject matter jurisdiction," <u>id.</u> at 7-8, that the Secretary cannot be sued under <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), on a theory of <u>respondeat superior</u> liability, <u>id.</u> at 8, and that the plaintiff's "suit cannot be maintained against [the Secretary] in his individual capacity" because "there are no allegations [in the Amended Complaint] from which it can be inferred that [the Secretary] was personally involved, or was even aware of, illegal conduct," <u>id.</u> at 9.  The Secretary also asserts that the Court should abstain from "affecting an on-going criminal proceeding in a state court" under the Supreme Court's rulings in <u>Younger v. Harris</u>, 401 U.S. 37 (1971), and <u>Douglas v. City of Jeannette</u>, 319 U.S. 157 (1943), <u>id.</u> at 11-13, that the Secretary would be harmed by any injunctive relief granted by the Court because he "has an interest in promoting the self-governance of the people of American Samoa and in ensuring that the provisions implemented for local governance by the Samoan people are given the proper deference and upheld," <u>id.</u> at 13, and that "the public will not benefit if litigants in American Samoa are routinely permitted to

seek judicial review by Article III [c]ourts of decisions made by an Art[icle] IV [c]ourt," id. at 13-14.

The American Samoa Defendants argue that this Court "is not the most convenient forum" for the litigation of this case, Am. Samoa Opp'n at 4-5, that the plaintiff has "failed to exhaust all remedies within American Samoa [j]urisdiction," id. at 5-6, and that "[the p]laintiff is not being refused any medical care or medical treatment available on [the] island" as a factual matter, id. at 8. They further argue that "[t]erritorial employees are not 'persons' under 42 U.S.C. § 1983, and 'therefore [are] not exposed to [section] 1983 liability,'" id. at 10 (quoting Ngiraingas v. Sanchez, 495 U.S. 182, 192 (1990)), that "governmental employees" of American Samoa "are individually protected and immune from suit" under American Samoa and federal law "if they acted within the[ir official] capacity and authority," id. (citing 28 U.S.C. § 2680(a); Am. Samoa Code § 43.1203(b)(1)(2)(4)), that the plaintiff's attorney "has dirty hands," id. at 10-11, and that the Court "cannot by injunctive process control or direct a head of an executive department in the discharging of any constitutional executive duty involving the exercise of judgment or discretion," id. at 11 (citing Panama Refining Co. v. Ryan, 293 U.S. 388 (1935)). Defendant Hales argues separately that he "is an Assistant Attorney General with limited duties and powers," Hales Mot. at 6, who "cannot order the [p]laintiff to be given medical care," id., "cannot order the [g]overnment to pay for off[-]island medical care," id., and "is only listed on this complaint because he handled the [p]laintiff's appeal before the High Court of American Samoa and opposed [the p]laintiff's improper request for off[-]island care," id.[6]

---

[6] Hales also argues that he should be dismissed from this case because he has resigned from the Attorney General's Office, Second Hales Mot. at 8, but this fact has no bearing on the Court's assessment of his conduct while

(continued...)

For the reasons set forth in greater detail below, the Court agrees with the defendants that the plaintiff is highly unlikely to succeed on the merits of his claim. Success is unlikely because the Court cannot entertain a suit against the American Samoa and LBJ Center Defendants in their official capacities under § 1983, and the Court cannot fathom any basis for exercising personal jurisdiction over these defendants in their individual capacities. However, even if the Court could consider the defendant's suit insofar as it seeks damages against these defendants, it is highly unlikely that the plaintiff will be able to demonstrate a violation of his Eighth Amendment rights. As for the plaintiff's suit against the Secretary, the only relief that the Court could possibly direct at him to address the objectives sought by the plaintiff would be in the form of a mandamus, but the plaintiff has not demonstrated grounds for this extreme form of relief. In any event, the Court would probably dismiss this case even if these problems did not exist under traditional doctrines of abstention.

1.    The American Samoa and LBJ Center Defendants

As a threshold matter, the American Samoa Defendants argue that they are absolutely immune from suit under § 1983 because they are not "persons" within the meaning of that statute. Am. Samoa Opp'n at 10; Hales Mot. at 6. They are half-right. In Ngiraingas v. Sanchez, 495 U.S. 182 (1990), the Supreme Court considered whether the Territory of Guam was a "person" within the meaning of § 1983, which provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any . . . Territory . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights,

---

[6](...continued)
he was acting as an Assistant Attorney General, for which the plaintiff presumably seeks damages. See Am. Compl. at 13 (seeking general, special and punitive damages from the defendants).

privileges, or immunities secured by the Constitution and laws, shall be liable to the party

injured." (Emphasis added.) After scrutinizing the statute's "language and purpose," Ngiraingas,

495 U.S. at 186, the Supreme Court found that "§ 1983's history uncovers no sign that Congress

was thinking of Territories when it enacted the statute over a century ago in 1871," id. at 187,

and that "the successive enactments of the statute, in context, further reveal the lack of any intent

on the part of Congress to include Territories as persons," id. at 189. The Supreme Court

therefore concluded that "Congress did not intend to include Territories as persons who would be

liable under § 1983." Id. at 192.

Like Guam, America Samoa is a United States territory, King, 520 F.2d at 1142, and

therefore not a "person" within the meaning of § 1983. Further, "if [American Samoa] is not a

person, neither are its officers acting in their official capacity." Ngiraingas, 495 U.S. at 192. But

this does not mean that American Samoa officials cannot be sued in their individual capacities if

they violate the constitutional rights of another while acting under color of territorial law.

Plainly, the language of § 1983 encompasses such individuals. See id. at 190-91 (recognizing

that in 1874 Congress amended § 1983 to provide that "a person acting under color of territorial

law [could] be held liable under that statute"). Thus, the American Samoa Defendants are right

to suggest that they (and the LBJ Center Defendants, to the extent that they could act in any

official capacity) are immune from suit under § 1983 in their official capacities, but they are

wrong to think that this immunity insulates them from the statute's reach altogether.

Nevertheless, there are other, seemingly insuperable hurdles to the plaintiff's suit against

the American Samoa and LBJ Center defendants in their individual capacities, the first of which

is the Court's apparent lack of personal jurisdiction over all of the American Samoa and LBJ

Center Defendants except Hales.  Personal jurisdiction "is an essential element of district court

jurisdiction of a district court, without which the court is powerless to proceed to an

adjudication."  Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584 (1999).  "[B]efore a court

may exercise personal jurisdiction over a defendant, there must be more than notice to the

defendant . . . ."  Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 104 (1987).  There

must also be "a sufficient connection between the defendant and the forum State to make it fair

to require defense of the action in the forum."  Kulko v. Super. Ct. of California in and for City

of San Francisco, 436 U.S. 84, 91 (1978).

        The "traditional approach" followed by courts in this Circuit to determine whether there

is a sufficient connection between the defendants to a suit and the forum in which the suit is

brought is to "ask[] first whether there [is] an applicable long-arm statute that would authorize

service on the defendants, and then whether the application of such a statute would comply with

the demands of due process."  Mwani v. bin Laden, 417 F.3d 1, 8 (D.C. Cir. 2005).  This latter

requirement places the onus on the plaintiff to demonstrate that there are "'minimum contacts'

between the defendant and the forum establishing that 'the maintenance of the suit does not

offend traditional notions of fair play and substantial justice.'"  GTE New Media Servs. Inc. v.

BellSouth Corp., 199 F.3d 1343, 1347 (D.C. Cir. 2000) (quoting Int'l Shoe Co. v. Washington,

326 U.S. 310, 316 (1945) (internal quotation omitted)).  "Under the 'minimum contacts'

standard, courts must insure that 'the defendant's conduct and connection with the forum State

are such that he should reasonably anticipate being haled into court there.'"  Id. (quoting World-

Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

Here, the plaintiff cannot satisfy the first requirement to establish personal jurisdiction, let alone the second. The District of Columbia's long-arm statute applies in this case due to the absence of any federal long-arm statute. See, e.g., Ibrahim v. District of Columbia, 357 F. Supp. 2d 187, 192-93 (D.D.C. 2004) (determining whether personal jurisdiction exists over defendants outside the forum in which the underlying suit was commenced in § 1983 suit under District of Columbia long-arm statute); Charles v. Kelly, 790 F. Supp. 344, 348 (D.D.C. 1992) (same). That statute provides in pertinent part that

> A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's – (1) transacting any business in the District of Columbia; (2) contracting to supply services in the District of Columbia; (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia; (5) having an interest in, using, or possessing real property in the District of Columbia; (6) contracting to insure or act as a surety for or on any person, property, or risk, contract, obligation, or agreement located, executed, or to be performed within the District of Columbia at the time of the contracting, unless the parties otherwise provide in writing; or (7) marital or parent and child relationship in the District of Columbia . . . .

D.C. Code Ann. § 13-423(a) (2001).

The plaintiff has not met his burden of establishing that the American Samoa and LBJ Defendants fall into one or more of these seven categories. As the American Samoa Defendants note in their opposition to the plaintiff's renewed motion, "American Samoa is thousands of miles and seven hours behind the District of Columbia." Am. Samoa Opp'n at 4. Nothing in the limited record before the Court suggests that any of the defendants other than the Secretary have

17

ever "transact[ed] any business in the District of Columbia," D.C. Code Ann. § 13-423(a)(1),

"contract[ed] to supply services in the District of Columbia," id. at § 13-423(a)(2), "contract[ed]

to insure or act as a surety" for anyone or any agreement "located, executed, or to be performed

within the District of Columbia," id. at § 13-423(a)(6), held "an interest in, us[es], or possess[es]

real property in the District of Columbia," id. at § 13-423(a)(5), or had a "marital or parent and

child relationship in the District of Columbia," id. at § 13-423(a)(7). And while the Court could

construe the plaintiff's allegations as stating a claim for "tortious injur[ies]," such injuries are not

alleged to have occurred or manifested in the District of Columbia as required by the District of

Columbia long-arm statute. Id. at §§ 13-423(a)(3), 13-423(a)(4).

Even if the District of Columbia long-arm statute permitted the Court to exercise personal

jurisdiction over the American Samoa and LBJ Center Defendants in their individual capacities,

it would violate the due process rights of these defendants to do so based on the record before the

Court. See GTE New Media Servs. Inc., 199 F.3d at 1347 ("Even when the literal terms of the

long-arm statute have been satisfied, a plaintiff must show that the exercise of personal

jurisdiction is within the permissible bounds of the Due Process Clause."). The Due Process

Clause of the Fourteenth Amendment "protects an individual's liberty interest in not being

subject to the binding judgments of a forum with which he has established no meaningful

contacts, ties, or relation," Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985)

(internal quotation omitted), "[b]y requiring that individuals have fair warning that a particular

activity may subject them to the jurisdiction of a foreign sovereign," id. at 472 (internal quotation

omitted). "[T]his fair warning requirement is satisfied if the defendant has purposefully directed

18

his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities."  Id. (internal quotations and citation omitted).

In this case, there is no evidence that any of the American Samoa or LBJ Center Defendants "purposefully directed" any activities at residents of the District of Columbia.  Nor is there any evidence that any of these defendants have any "contacts, ties, or relation" to the District of Columbia other than through the plaintiff's lawsuit.  Id.  Asserting personal jurisdiction over such defendants would therefore not comport with the fundamental notions of "'fair play and substantial justice'" that inform the minimum contacts rule.  Id. at 477 (quoting Int'l Shoe Co., 326 U.S. at 320).

Of course, the American Samoa and LBJ Center Defendants can always waive their personal jurisdiction defenses by explicitly consenting to the Court's jurisdiction or by failing to raise the personal jurisdiction issue in any responsive motions filed under Federal Rule of Civil Procedure 12.  See Fed. R. Civ. P. 12(h)(1) (defense of lack of personal jurisdiction waived "if omitted from a motion in the circumstances described in [Rule 12](g)"); id. at 12(g) (party making motion under Rule 12 that "omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion . . . shall not thereafter make a motion based on the defense or objection so omitted").  But aside from Hales, who has filed a separate motion to dismiss the plaintiff's Amended Complaint for lack of subject-matter jurisdiction, Hales Mot. at 6-7, and failure to state a claim for which relief can be granted, id. at 3-6, the American Samoa and LBJ Center Defendants have not waived their personal jurisdiction rights. See Am. Samoa Answer at 10 (asserting as affirmative defenses that "[j]urisdiction in this matter is improper" along with "[i]nsufficiency of process and insufficiency of service of process"); LBJ

19

Center Answer at 11 (same).  And the Court cannot exercise personal jurisdiction over these defendants otherwise.  See Fed. R. Civ. P. 12(h)(1) (requiring that defendants raise defenses of, inter alia, lack of personal jurisdiction or insufficient service of process, "by motion" under Rule 12 or "in a responsive pleading").  But see Barnstead Broad. Corp. v. Offshore Broad. Corp., 869 F. Supp. 35, 38-39 (D.D.C. 1994) (holding that the failure to raise lack of personal jurisdiction in opposition to motion for preliminary injunction constitutes a waiver of such objection "'by submission [in a cause] through conduct'" (quoting Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & Allied Indus. Fund, 967 F.2d 688, 692)).

Assuming arguendo that the Court were able somehow to assert personal  jurisdiction over all of the American Samoa and LBJ Center Defendants, it is still highly unlikely that the plaintiff would succeed on the merits of his claims.  The basis for the plaintiff's § 1983 claim is the alleged violation of the plaintiff's Eighth Amendment right to be free from punishment that is "cruel and unusual."  See Pl. Mem. at 10-15 (arguing that the plaintiff "is entitled to . . . basic medical care" under the Eighth Amendment).  Beginning in Estelle v. Gamble, 429 U.S. 97 (1976), the Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment."  Id. at 104 (internal quotation and citation omitted).  "This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment."  Id. at 105.  Rather, the "deprivation alleged" must be "sufficiently serious," and "a prison official must have a sufficiently culpable state of mind," which "[i]n prison condition cases . . . is one of deliberate indifference to inmate

health or safety," to properly state an Eighth Amendment claim for inadequate medical treatment. Farmer v. Brennan, 511 U.S. 825, 834 (1994) (internal quotations omitted).

Nothing in the limited record before the Court supports the plaintiff's contention that any of the American Samoa Defendants have acted with "deliberate indifference" to his medical condition. "To show deliberate indifference," the plaintiff must show "that officials had subjective knowledge of the serious medical need and recklessly disregarded the excessive risk to inmate health or safety from that risk." Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003). "[T]he official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." Farmer, 511 U.S. at 837. The only American Samoa Defendants who are even alleged to know about the plaintiff's medical condition are Governor Tulafono, Attorney General Ripley, and Hales. See Am. Compl. ¶ 39 ("[o]n or about July 27, 2007, [the p]laintiff's counsel informed [the] Governor . . . about [the p]laintiff's failure to receive medical care and treatment . . . and the continued denial of medical care and treatment for [the p]laintiff"); id. ¶¶ 32, 34 ("[o]n July 12, 2007, the High Court . . . ordered the Attorney General to meet with [the p]laintiff's counsel to discuss the medical condition issue and set in motion appropriate action to determine the issue" (internal quotation omitted)); Seitz Aff. ¶¶ 18-20 (relating phone conversation between the plaintiff's attorney and Hales concerning the plaintiff's medical situation). "Without actual knowledge," the other American Samoa Defendants "could not have deliberately sought to withhold care for a serious medical need or ignored [the plaintiff's] requests for medical care." Arnold v. Moore, 980 F. Supp. 28, 34 (D.D.C. 1997).

As for those American Samoa Defendants who are alleged to have been informed of the plaintiff's medical condition, Governor Tulafono has not been involved in this case personally in any way whatsoever, see Seitz Aff. ¶ 13 (explaining that Governor Tulafono learned of "[the p]laintiff's failure to receive medical care and treatment" in a "facsimile communication" sent on July 27, 2007), and Attorney General Ripley's involvement is limited to one encounter with the plaintiff's attorney after a hearing on the plaintiff's emergency motion for release in the American Samoa High Court and two follow-up conversations with Hales regarding the proper course of action in investigating the plaintiff's claims. See Seitz Aff. ¶ 8 (recounting meeting between the plaintiff's attorney and Attorney General Ripley "and two of his deputies"); Hales Aff. ¶¶ 8, 11 (recounting Hales's discussions with Attorney General Ripley). Hales engaged in a subsequent communication with the plaintiff's attorney that did not involve Attorney General Ripley. See Seitz Aff. ¶¶ 18-20 (recounting phone conversation between Hales and the plaintiff's attorney); Hales Aff. ¶ 12 (same). These minimal actions by Governor Tulafono and Attorney General Ripley (or lack thereof, in the case of Governor Tulafono) hardly suggest "the obduracy and wantonness that mark deliberate indifference." Franklin v. District of Columbia, 163 F.3d 625, 636 (D.C. Cir. 1998) (internal quotation omitted).

Finally, nothing in the record remotely suggests that Hales has acted with "reckless[] disregard[]" for the plaintiff's medical condition. Baker, 326 F.3d at 1306. As the plaintiff freely admits, Hales has made arrangements for the plaintiff to be transferred to a prison facility in Hawaii where he can receive the diagnostic tests that he so ardently desires. See Seitz Aff. ¶¶ 18-19 ("Hales advised me that the Government of American Samoa had been in contact with the Director of the Department of Public Safety for the State of Hawaii ," and that "Hawaii state

corrections officials had indicated their willingness to house [the p]laintiff"). The only <u>caveat</u> that Hales has placed on his offer to relocate the plaintiff is that the plaintiff must pay for the costs of his transfer to Hawaii if the LBJ Center does not approve the plaintiff's request for off-island care. <u>See</u> Hales Aff. ¶ 12 ("I also told Seitz that if the [p]laintiff was approved by the Off[-]Island Referral [Committee], the American Samoa Government would pay for all those costs. However, I also stated [that] if the [p]laintiff was not approved, the [p]laintiff would have to pay for all additional costs.").

The plaintiff's attorney derides this offer because "[the p]laintiff has no financial resources or available insurance to cover any of the costs for the medical care he requires." Seitz Aff. ¶ 20. But Hales does not "suggest that the appropriate care could be forthcoming if [the plaintiff were] willing and able to pay for it himself," as the plaintiff's attorney intimates. Seitz Reply Aff. ¶ 15. Rather, he seeks an objective assessment from the organization best-qualified to determine the "appropriate care" for the plaintiff's medical condition – the LBJ Center's Off-Island Medical Referral Program Committee (the "MRPC") – before agreeing to spend the American Samoa taxpayers' money in satisfaction of the plaintiff's request.

The plaintiff does not allege, much less point to any evidence, that Hales has ignored a recommendation from the MRPC to transfer the plaintiff to a medical facility outside American Samoa, or that Hales and the LBJ Center have colluded to deny such a transfer.[7] Instead, he

---

[7] The plaintiff's attorney insinuates that all of the American Samoa and LBJ Center Defendants have acted in concert to deny the plaintiff's request for a transfer due to a lack of funding. <u>See</u> Seitz Aff. ¶ 17 ("I am informed and believe that given the financial situation in American Samoa[, the] LBJ [Center] cannot and will not pay for any costs associated with [the p]laintiff's 'off-island' care even if such care is determined to be required."); Seitz Reply Aff. ¶ 15 ("one of the primary impediments to obtaining the medical care [that the plaintiff] requires is the issue of funding"). This scenario is unlikely. The evidence submitted by the plaintiff suggests that the LBJ Center <u>might</u> not have any money left in its budget for off-island referrals. <u>See</u> Seitz Aff. at Ex. I-1:8-10 (Fili Sagapolutele, <u>LBJ off-</u>

(continued...)

would have the Court conclude that Hales must disregard entirely the normal procedures for determining whether a patient at the LBJ Center should be referred to another medical facility outside American Samoa based solely on the Saleapaga Letter because the plaintiff is a prisoner in the custody of the American Samoa government.  See Pl. Mem. at 13 ("[T]he [d]efendants have acted with deliberate indifference by ignoring the recommendations of Dr. Saleapaga . . . that [the p]laintiff [should] receive basic neurological evaluations . . . as well as cardiac evaluations . . . .").  The Court finds this proposition untenable.

The High Court directed Attorney General Ripley and his office to "oversee a complete and thorough investigation into [the plaintiff's] present medical condition . . . to properly determine whether or not [the American Samoa government] . . . must arrange to provide [the plaintiff] with necessary medical care outside . . . American Samoa."  High Court Order at 2. Requiring the plaintiff to obtain approval from the MRPC is entirely consistent with the High Court Order.  Indeed, Hales would actually have to defy the High Court Order to transfer the plaintiff to Hawaii without first "investigat[ing]" the plaintiff's medical condition.

If anything, Hales has gone above and beyond the call of duty by arranging for the transfer of the plaintiff (at the plaintiff's expense) even if the MRPC does not find the plaintiff to

---

[7](...continued)
island program over budget by $2 M, Samoa News (Aug. 15, 2007)) (the "Samoa News Article") ("The LBJ Medical Center estimates an over budget for fiscal year 2007 due to the increase in off-island medical referral expenses").  But see id. at 1:16-20 ("LBJ met with the governor in April to discuss closing the program, . . . but 'the governor asked to keep the program open, and will ask for a special Fono appropriation to cover the over budget for off[-]island expenditure[s]").  But the unrebutted testimony of Hales indicates that "the American Samoa [g]overnment would pay for all" of the plaintiff's costs for referral if the MRPC approved the plaintiff's request, not the LBJ Center.  Hales Aff. ¶ 12.  The Court finds it difficult to accept the notion that the entire American Samoa government is so impoverished that it cannot move him to Hawaii if necessary, although, according to the plaintiff's mother, the plaintiff believes this to be the case.  See Seitz Aff., Ex. J (E-mail from Rpmrem@aol.com to eseitzatty@yahoo.com (Aug. 5, 2007)) (the "August 5, 2007 E-mail") ("Richard [i.e., the plaintiff] told me that he has overheard prison personnel talking about how there's no money for his care; he has also overheard LBJ personnel saying the same.").

be an appropriate candidate for off-island referral.  The evidence does not suggest that Hales has

breached any duty to the plaintiff in any respect, and it certainly does not indicate that he has

treated the plaintiff's medical condition with "deliberate indifference."  It is therefore extremely

unlikely that the plaintiff will succeed on the merits of his claim against Hales even if the Court

could exercise personal jurisdiction over him.

It is also unlikely that the plaintiff could succeed on the merits of his Eighth Amendment

arguments with respect to most of the LBJ Center Defendants.  As explained by Hales, the

MRPC has not determined whether the plaintiff is an appropriate candidate for off-island referral

because the plaintiff "has not properly applied to the [MRPC] and [he] needed to [do so] before

any assessment could be made."  Hales Aff. ¶ 13.  These steps, as set forth in the LBJ Center's

referral policies and procedures, are as follows:

> The Referring Physician is the primary attending physician who
> initiates a referral and assumes overall responsibilities for managing
> a patient referral.  Prior to presentation to MRPC, the Referring
> Physician will conduct the duties outlined below by observing the
> following steps:
>
> Evaluate the patient[']s activity level and performance status[,]
> physical characteristics, disease symptoms, functional abilities,
> psychological state, social roles, and treatment side effects.
>
> Conduct a pre-referral diagnostic work-up in order to determine that
> a patient requires medical treatment or diagnostic procedures beyond
> the capability of the staff or equipment of the LBJ [Center].  Based on
> this diagnostic work-up, the attending physician will prepare the
> Medical Referral Form, which the MRPC uses to evaluate the request
> for referral.
>
> Discuss fully with the patient all potential risks, complications and
> benefits that may ensue from proposed medical intervention.

> Consider patient beliefs and desires in relation to proposed medical intervention: (e.g., an[] end-stage renal patient should not be referred if he declines dialysis; a Jehovah's Witness who will decline [a] transfusion should not be referred for [a] surgery [that] will likely require [a] transfusion).
>
> Upon concurrence of the Chief of Service, complete in full the (MFR) medical referral form, and prepare a case presentation for the MRPC. The completed referral form will be given to the Referral Coordinator[,] who will make a copy for each MRPC member. Patient medical records[,] including lab reports, x-rays, etc. should be available for MRPC review.

Hales Aff., Ex. C (Off-Island Medical Referral Program Policies and Procedures) (the "MRP Policies and Procedures") at 7 (emphasis in original). These requirements apply even in emergency situations. See MRP Policies and Procedures at 9 (explaining that "[t]he referral program will be initiated by the primary physician as usual" for emergency referrals).

Arguably, Dr. Saleapaga, the closest equivalent to a "Referring Physician" identified by the plaintiff, "evaluated the patient[']s activity level and performance status[,] physical characteristics, disease symptoms, functional abilities, psychological state, social roles, and treatment side effects" when he examined the plaintiff in March of 2007 and "determine[d] that [the plaintiff] requires . . . diagnostic procedures beyond the capability of the staff or equipment of the LBJ [Center]," as reflected in his June 13, 2007 letter. Id.; see also Saleapaga Letter at 2 (noting that the tests needed by the plaintiff "are not available at LBJ Medical Center, American Samoa but off-island"). But the plaintiff does not allege, and no evidence in the record suggests, that Dr. Saleapaga prepared a "Medical Referral Form," obtained the "concurrence of the Chief of Service," or ever "prepare[d] a case presentation for the MRPC" as required by the MRP Policies and Procedures. MRP Policies and Procedures at 7. As alleged by the plaintiff, the only

thing that Dr. Saleapaga ever did was write a letter for the defendant on June 13, 2007, Am.

Compl. ¶ 27, which the plaintiff's attorney subsequently faxed to the LBJ Center's attorney and

the head of the MRPC, id. ¶¶ 35-36, 40. This does not comply with the MRP Policies and

Procedures, and therefore provides a legitimate basis for the MRPC's refusal to consider the

plaintiff's request for a transfer off-island.

To the extent that the LBJ Defendants' rigid adherence to the requirements of the MRPC

Policies and Procedures may be subject to challenge, "it is hard to see how imperfect

enforcement of a policy can, alone, satisfy [the 'due diligence' test's] subjective element" absent

"proof that senior policymakers or other [LBJ Center] officials intentionally deprived prisoners

of access to medical care, . . . or willfully violated their duty of care." Franklin, 163 F.3d at 636.

Here, there is no evidence that the MRP Policies and Procedures – which apply to all of the LBJ

Center's patients, not just those patients who happen to be incarcerated – were designed to

prevent prisoners from receiving adequate medical care, or that the policies and procedures have

been enforced in a selective manner against prisoners like the plaintiff. There is only the

plaintiff's naked contention that he merits a transfer to another medical facility because Dr.

Saleapaga recommended that course of action in his letter. See Pl. Mem. at 13 (arguing that the

"[d]efendants have acted with deliberate indifference by ignoring the recommendations of Dr.

Saleapaga").

In many ways, the plaintiff's situation is analogous to that faced by the plaintiff in Estelle,

the first Supreme Court case discussing the applicability of the Eighth Amendment to prisoner

medical treatment. In that case, J.W. Gamble, "an inmate of the Texas Department of

Corrections, was injured . . . while performing a prison work assignment." Estelle, 429 U.S. at

27

98.  Thereafter, Gamble repeatedly complained of severe back pain, migraine headaches, chest

pains, and "blank outs."  Id. at 99-100.  In response to these complaints, "Gamble was seen by

medical personnel on 17 occasions spanning a 3-month period," where he received treatment for

"his back injury, blood pressure, and heart problems."  Id. at 107.  Nevertheless, Gamble asserted

that he had been denied adequate medical care because "more should have been done by way of

diagnosis and treatment," and argued that "a number of options" had not been pursued by his

doctors.  Id.

        While the Supreme Court recognized that "deliberate indifference to a prisoner's serious

illness or injury states a cause of action under § 1983," id. at 105, it concluded that "Gamble's

claims . . . are not cognizable under § 1983."  Id. at 107.  The Court stated unequivocally that "a

complaint that a physician has been negligent in diagnosing or treating a medical condition does

not state a valid claim of medical mistreatment under the Eighth Amendment."  Id. at 106.  The

Court reasoned that "[a] medical decision not to order an X-ray, or like measures, does not

represent cruel and unusual punishment," but rather is "[a]t most . . . medical malpractice," for

which the "proper forum is the state court" in which the prisoner resides, id. at 107.

        Like the plaintiff in Estelle, the plaintiff in this case complains of various amorphous

symptoms that cause him severe discomfort.  See Am. Compl. ¶¶ 24, 42 (describing "episodes"

in which the plaintiff has suffered "loss of consciousness and physical injuries to his head").

Like the plaintiff in Estelle, the plaintiff here argues that "more should [be] done by way of

diagnosis and treatment," Estelle, 429 U.S. at 107, in this case by transferring him to another

medical facility with superior diagnostic equipment.  And like the plaintiff in Estelle, the plaintiff

in this case confuses his potential cause of action for medical malpractice, a claim which should

28

be raised in the territorial courts of American Samoa, with a violation of his constitutional rights.

See id. at 106 ("Medical malpractice does not become a constitutional violation merely because

the victim is a prisoner.").  The Court simply cannot "sit as [a] board[] of review over the

medical decisions" (or, for that matter, the policies and procedures that inform those decisions)

of the LBJ Center on a § 1983 claim, nor will it "second-guess the adequacy of a particular

course of treatment" prescribed by the Center's officials.  O.K. v. Bush, 344 F. Supp. 2d 44, 61

(D.D.C. 2004).

The only allegation made by the plaintiff that legitimately implicates Eighth Amendment

concerns is his allegation that the LBJ Center will no longer provide medical care of any kind to

the plaintiff.  See Pl. Mem. at 8-9 (making this allegation for the first time).[8]  In his affidavit in

support of the plaintiff's renewed motion, the plaintiff's attorney claims that he is "informed that

[the p]laintiff was examined by a LBJ Center physician who explained to [the p]laintiff that he

could not treat [the p]laintiff without authorization from a representative of [the] LBJ Center's

hospital administration," Seitz Aff. ¶ 25, and that the same physician "was, thereafter, instructed

by [Terry Lovelace, the general counsel for the LBJ Center,] not to provide any treatment to

[the p]laintiff," id. ¶ 26.  See also Seitz Reply Aff. ¶ 5 ("after September 3, 2007, when this

lawsuit was filed, [the] LBJ [Center] terminated all care and medications for [the plaintiff] and

has refused to see or treat him further").  The plaintiff's attorney further states that he is

"informed and believe[s] that [the p]laintiff now is being denied his previously prescribed pain

---

[8]  The plaintiff's assertions that the LBJ Center has refused to provide him any medical care whatsoever are not included in his Amended Complaint, but if the Court were to conclude that it could hear the merits of these assertions, it would be inclined to grant the plaintiff leave to file a second amended complaint incorporating these allegations.

medications for pre-existing migraine and other neurological treatments in response to [the plaintiff's] efforts to ensure that [he] receives the basic medical care and treatment to which he is entitled under the United States Constitution."  Seitz Aff. ¶ 23; see also Seitz Reply Aff. ¶ 6 ("[a]lthough the doctors at [the] LBJ [Center] apparently suspected that the causes of [the plaintiff's] medical complaints may be related to drug addiction issues . . . , they never attempted to rule out more serious diagnoses").[9]  These assertions, if true, would indicate that at least some of the LBJ Center Defendants are now acting with "a total unconcern for [the plaintiff's] welfare in the face of serious risks" in violation of the plaintiff's Eighth Amendment rights.  Pryor-El v. Kelly, 892 F. Supp. 261, 268 (D.D.C. 1995).

As disturbing as these assertions may be, however, they do not change the fact that the Court likely cannot exercise personal jurisdiction over any of the LBJ Defendants.  Moreover, several of the LBJ Defendants have no apparent connection to this more recent development in the plaintiff's medical care at all, and would need to be dismissed from this action even if the Court concluded that it could exercise personal jurisdiction in this case.  In short, the only successful claim that the plaintiff could likely prosecute would be against a handful of the LBJ Defendants on the narrow basis that these defendants have deprived him of any and all medical care, and even that claim likely cannot be entertained by this Court.

---

[9]  The source of this "inform[ation]" is apparently the plaintiff himself.  See Seitz Aff. ¶ 24 ("On or about August 21, 2007, I spoke by telephone with [the p]laintiff. . . . [H]e informed me that on . . . August 20, 2007, he was taken . . . to [the] LBJ Center's emergency room . . . ."); August 5, 2007 E-mail (relating the plaintiff's representation that "a nurse practitioner told him that she could no longer give him any narcotic pain medication because the DEA would not allow it").

2.    The Secretary

There are numerous defects in the plaintiff's lawsuit with respect to the Secretary as well.

As an initial matter, "[§] 1983 does not apply to federal officials acting under color of federal

law."  Settles v. United States Parole Comm'n, 429 F.3d 1098, 1104 (D.C. Cir. 2005); see also

Risley v. Hawk, 918 F. Supp. 18, 21 (D.D.C. 1996) ("Section 1983 expressly requires 'state

action,' which is not alleged in the present litigation because the defendants are federal

employees and the claims arise out of the treatment of [a] plaintiff in a federal prison.").[10]

Instead, the Secretary can only be sued for damages under the implied cause of action against

federal officials recognized by the Supreme Court in Bivens v. Six Unknown Named Agents of

Federal Bureau of Narcotics, 403 U.S. 388 (1971).  But "Bivens liability does not run against a

federal agency, [] only against individual federal agents," Kaufmann v. Anglo-American Sch. of

Sofia, 28 F.3d 1223, 1226 (D.C. Cir. 1994) (citing FDIC v. Meyer, 510 U.S. 471 (1994)),[11] so "a

---

[10]  One could argue that the Secretary is acting under color of American Samoa law for purposes of this suit because the alleged violations of the plaintiff's Eighth Amendment rights was committed in an American Samoa prison by American Samoa officials, and the Secretary is being sued in his capacity as the person "vested with . . . administrative, regulatory[,] and fiscal authority for the administration of . . . American Samoa." Am. Compl. ¶ 6; cf. Fletcher v. District of Columbia, 370 F.3d 1223, 1227 & n.* (D.C. Cir. 2004) (holding that United States Parole Commission board members could be held liable under § 1983 for actions taken pursuant to District of Columbia law), vacated on other grounds by Fletcher v. District of Columbia, 391 F.3d 250, 251 (D.C. Cir. 2004). If this were true, however, the Secretary would be considered part of the American Samoa government rather than the Department of Interior insofar as he is being sued in his official capacity, and would therefore not be considered a "person" for purposes of § 1983 under the Supreme Court's ruling in Ngiraingas.  See part III.A.1, supra.  Either way, it appears exceedingly unlikely that the plaintiff can pursue any claim for alleged violations of his Eighth Amendment rights against the Secretary in his official capacity.

[11]  In Meyer, a senior officer at Fidelity Savings and Loan Association ("Fidelity"), John H. Meyer, sued the Federal Savings and Loan Insurance Corporation (the "FSLIC") and Robert L. Pattulo, a representative of the FSLIC, for terminating his employment after the FSLIC was appointed as a receiver for Fidelity under California state and federal law.  Meyer, 510 U.S. at 473-74.  Meyer alleged that the FSLIC and Pattulo violated his Fifth Amendment due process rights by depriving him of his right to continued employment, which, he alleged, was a property interest conferred upon him by California law.  Id. at 474.  The Supreme Court concluded that the "sue-and-be-sued waiver" contained within the statutory provision creating the FSLIC permitted Meyer to bring any valid causes of action that he possessed against the FSLIC, id. at 480-83, but that Meyer could not sue the FSLIC under Bivens because "to imply a damages action directly against federal agencies, thereby permitting claimants to bypass

(continued...)

31

Bivens action may be maintained against a defendant only in his or her individual capacity, and not in his or her official capacity." Pollack v. Meese, 737 F. Supp. 663, 666 (D.D.C. 1990).[12]

This rule affects the viability of the plaintiff's suit in two ways. First, the plaintiff cannot serve process on the Secretary merely by complying with Federal Rule of Civil Procedure 4(i)(1) and "sending a copy of the summons and complaint by registered or certified mail to the officer, employee, agency, or corporation" being sued, Fed. R. Civ. P. 4(i)(2)(A),[13] but must instead serve

---

[11](...continued)
qualified immunity" would extinguish the need "for aggrieved parties to bring damages actions against individual officers," and "the purpose of Bivens is to deter the officer." Id. at 484-85 (emphasis in original). The Supreme Court further noted the "potentially enormous financial burden for the Federal Government" that would result if the Court "were to recognize a direct action for damages against federal agencies" in reaching its conclusion. Id. at 486.

[12] Pollack, decided three years prior to Meyer by another member of this Court, was issued at a time when the prevailing rationale for denying plaintiffs the ability to file suits under Bivens against federal agencies was that such suits ran afoul of the United States's sovereign immunity. See Clark v. Library of Congress, 750 F.2d 89, 103 (D.C. Cir. 1984) ("Sovereign immunity . . . bar[s] suits for money damages against officials in their official capacity absent a specific waiver by the government."). If this were the only basis for rejecting a plaintiff's suit under Bivens against a federal agent or officer acting in an official capacity, the plaintiff could conceivably maintain his suit against the Secretary in his official capacity insofar as he seeks injunctive relief. See id. at 102 ("the 1976 amendments to § 702 of the Administrative Procedure Act, 5 U.S.C. § 702, eliminated the sovereign immunity defense in virtually all actions for non-monetary relief against a U.S. agency or officer acting in an official capacity"); see also Chamber of Commerce of the United States v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not."). In Meyer, however, the Supreme Court made clear that a suit based on allegations of constitutional violations by federal agencies or officials acting in an official capacity are not only barred by sovereign immunity, but also fail to state a claim for relief under Bivens. See Meyer, 510 U.S. at 483-85 (agreeing with the Ninth Circuit that there "ha[d] been a waiver of sovereign immunity" in that case, but differing with the Circuit Court as to "whether the source of substantive law upon which the claimant relies provides an avenue for relief"); see also Correctional Servs. Corp. v. Malesko, 534 U.S. 61, 69 (2001) ("in FDIC v. Meyer, we unanimously declined an invitation to extend Bivens to permit suit against a federal agency, even though the agency – because Congress had waived sovereign immunity – was otherwise amenable to suit").

[13] Rule 4(i)(1) requires that a plaintiff serve a defendant

> (A) by delivering a copy of the summons and of the complaint to the United States attorney for the district in which the action is brought or to an assistant United States attorney or clerical employee designated by the United States attorney in a writing filed with the clerk of the court or by sending a copy of the summons and of the complaint by registered or certified mail addressed to the civil process clerk at the office of the United States attorney and

> (B) by also sending a copy of the summons and of the complaint by registered or

(continued...)

the Secretary in conformance with Rule 4(i)(1) <u>and</u> serve him personally in the manner required

by Rule 4(e), <u>see</u> <u>id.</u> at 4(i)(2)(B) ("Service on an officer or employee of the United States sued in

an individual capacity . . . is effected by serving the United States in the manner prescribed by

Rule 4(i)(1) <u>and by serving the officer or employee in the manner prescribed by Rule 4(e), (f), or</u>

<u>(g).</u>" (emphasis added)); <u>see also</u> <u>Simpkins v. District of Columbia Gov't</u>, 108 F.3d 366, 368-69

(agreeing with "every court of appeals that has spoken on the question . . . that defendants in

<u>Bivens</u> actions must be served as individuals, pursuant to Rule 4(e)").[14]  If such service is not

rendered within 120 days of the filing of the plaintiff's original complaint – here, by December

11, 2007 – then the plaintiff's suit must be dismissed for lack of personal jurisdiction unless the

---

[13](...continued)

> certified mail to the Attorney General of the United States at Washington, District of Columbia, and

> (C) in any action attacking the validity of an order of an officer or agency of the United States not made a party, by also sending a copy of the summons and of the complaint by registered or certified mail to the officer or agency.

[14]  Rule 4(e) requires that a plaintiff serve a defendant

> (1) pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State; or

> (2) by delivering a copy of the summons and of the complaint to the individual personally or by leaving copies thereof at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.

The rule for service of process on an individual in the District of Columbia is identical to Rule 4(e).  <u>See</u> D.C. Super. Ct. Civ. R. 4(e) (1997) (repeating <u>verbatim</u> the language of Federal Rule of Civil Procedure 4(e)); <u>Cheng v. Au</u>, 710 A.2d 877, 878-79 (D.C. 1998) (reciting this rule).  Thus, the plaintiff must demonstrate that he has delivered a copy of the summons and complaint to the Secretary personally or to a "person of suitable age and discretion residing" at the Secretary's "dwelling house or usual place of abode" or "to an agent authorized by appointment or by law to receive service of process" for the plaintiff's service of process to be sufficient.  Fed. R. Civ. P. 4(e)(2); D.C. Super. Ct. Civ. R. 4(e)(2).

Secretary consents to the jurisdiction of the Court. Fed. R. Civ. P. 4(m). Certain comments made by the Secretary in his opposition to the plaintiff's renewed motion suggest that personal service has not yet been effectuated on him. See Sec'y Opp'n at 3 (noting that "[t]he U.S. Attorney was served with the Amended [] Complaint on September 12, 2007, by certified mail," as required by Rule 4(i)(2), but not that the Secretary was personally served with process as required by Rule 4(e)).

It is not clear to the Court whether the Secretary has waived any defense based on lack of proper service by failing to raise that defense in his opposition to the plaintiff's renewed motion for preliminary injunctive relief. The Secretary captions his submission as both an opposition to the plaintiff's renewed motion and a motion to dismiss, presumably under Rules 12(b)(1) and 12(b)(6). Sec'y Opp'n at 1. Moreover, the Secretary explicitly requests that the plaintiff's lawsuit be dismissed against him both in his official and in his individual capacities, which would suggest that his opposition constituted a response to the plaintiff's lawsuit against him personally and also with respect to the plaintiff's lawsuit against his office. Id. at 8-9. If that is the case, the Secretary has arguably waived any defense available to him for lack of service of process by failing to assert that defense in his opposition to the plaintiff's renewed motion. See Fed. R. Civ. P. 12(h).

At the same, the opposition was filed by the United States Attorney for the District of Columbia and two of his assistants, who clearly do not represent the Secretary in his individual capacity. Sec'y Opp'n at 15. Moreover, the Secretary requests in his opposition that the Court grant him "an extension of time in which to seek legal representation in his individual capacity if the Court views this as a Bivens matter." Id. at 9. It may well be the case, then, that the

34

Secretary has responded only in his official capacity to the plaintiff's suit, and that he therefore

has not waived any defense that he might assert under Rule 12(b)(5).  In any event, the service of

process issue is yet another complication for the plaintiff to overcome if he is to succeed on the

merits of his lawsuit.

      The second implication of the rule that a <u>Bivens</u> action may only be maintained against a

federal official acting in his individual capacity is that it limits the scope of activities for which

the defendant can be held liable.  "<u>Bivens</u> claims cannot rest merely on <u>respondeat</u> <u>superior</u>."

<u>Simpkins</u>, 108 F.3d at 369.  Rather, "[t]he complaint must at least allege that the defendant

federal official was personally involved in the illegal conduct." <u>Id.</u>  As the Secretary correctly

notes,

> [The Secretary's] name only appears in paragraph six of the
> [Amended Complaint,] in which he is described as being "vested with
> and [as] exercis[ing] administrative, regulatory[,] and fiscal authority
> for the administration" of American Samoa.  There is no other
> mention of [the Secretary] in the [Amended Complaint] and there are
> no allegations from which it can be inferred that he was personally
> involved, or was even aware of, illegal conduct.

Sec'y Opp'n at 9 (quoting Am. Compl. ¶ 6) (all alterations made by the Court).  Thus, even if the

plaintiff is able to properly serve the Secretary under Rule 4(e) (or, more likely, the Secretary

waives or is found to have waived any defense of insufficiency of service), there is nothing in the

Amended Complaint that would remotely suggest individual liability by the Secretary in this

case.

      Given the plaintiff's inability to state a claim against the Secretary in either his official or

individual capacity under <u>Bivens</u>, the only conceivable avenue for relief that the plaintiff might

pursue would be the writ of mandamus.  <u>See</u> 28 U.S.C. § 1651(a) ("The Supreme Court and all

courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."); Am. Comp. ¶ 4 (alleging jurisdiction under, inter alia, § 1361).  This remedy is "a drastic one, to be invoked only in extraordinary situations."  Kerr v. U.S. Dist. Ct. for N. Dist. of Cal., 426 U.S. 394, 402 (1976); see also Weber v. United States, 209 F.3d 756, 760 (D.C. Cir. 2000) ("Mandamus is an extraordinary remedy whose issuance is guided by equitable principles.").  To qualify for such relief, the party seeking issuance of the writ must "have no other adequate means to attain the relief he desires," and he must demonstrate that "his right to issuance of the writ is clear and indisputable."  Kerr, 426 U.S. at 403 (internal quotation omitted); see also King, 520 F.2d at 1146 (writ of mandamus should issue "only when the duty of the officer to act is clearly established and plainly defined and the obligation to act is peremptory" (internal quotation omitted)).  "[E]ven if the plaintiff overcomes all these hurdles, whether mandamus relief should issue is discretionary," and as a practical matter "it is hardly ever granted."  In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005).

　　　The evidence before the Court suggests that the plaintiff will not be able to satisfy the most basic criteria for mandamus relief.  Far from demonstrating a lack of alternative means to effectuate the relief that he seeks, the plaintiff's own evidence indicates that the High Court is willing to ensure that proper medical care is provided to the plaintiff.  See High Court Order at 2 (recognizing that the American Samoa government "is obligated to provide [the plaintiff] with proper medical care"); see also Am. Samoa Rev. Const. Art. I § 6 (guaranteeing that "cruel or unusual punishments" shall not be "inflicted").  Moreover, with the possible exception of the alleged deprivation of all medical care for the plaintiff by the LBJ Center and certain of the other

36

LBJ Center Defendants, the plaintiff does not make out even a primae facie claim of an Eighth

Amendment violation, let alone a "clear and indisputable" right to issuance of the writ.  Kerr,

426 U.S. at 403 (internal quotation omitted).  The plaintiff simply has not demonstrated that this

is the type of "extraordinary situation[]" that would warrant the issuance of a writ of mandamus,

id. at 402; therefore, it is highly unlikely that his request for such relief will be successful on its

merits.

        3.      Abstention and the Colorado River doctrine

       Finally, the Court would likely abstain from considering the merits of this case even if it

could conclude that it is capable of exercising personal jurisdiction over the defendants and that

the plaintiff has alleged facts sufficient to state a claim against any of the defendants under

§ 1983, Bivens, or § 1651(a).  Broadly speaking, abstention is appropriate in three circumstances:

(1) where a federal court's consideration of a case would interfere with pending state criminal or,

in some instances, civil proceeding, see Younger v. Harris, 401 U.S. 37, 43-49 (1971) (setting

forth this rule in the context of criminal law); see also Pennzoil Co. v. Texaco, Inc., 481 U.S. 1,

10-12 (1987) (applying Younger abstention in the context of a civil suit); (2) where a federal

constitutional question might be avoided through the resolution of ambiguous state law by the

state courts, see R.R. Comm'n of Tex. v. Pullman Co., 312 U.S. 496, 498-501 (1941) (setting

forth this rule); or (3) where adjudication of a case would interfere with state regulation or

policymaking of substantial interest to the public of the state in question, see Burford v. Sun Oil

Co., 319 U.S. 315, 317-34 (1943) (setting forth this principle).[15]   These various doctrines of

---

    [15]  The Younger, Pullman, and Burford abstention doctrines "reflect[] the common-law background against
which the statutes conferring jurisdiction were enacted," and are rooted in the traditional authority of a federal court

(continued...)

abstention "embody the general notion that federal courts may decline to exercise their jurisdiction, in otherwise exceptional circumstances, where denying a federal forum would clearly serve an important countervailing interest."  City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 174 (1997) (internal quotation omitted).

The Secretary argues that this case should be dismissed under the Younger abstention doctrine.  Sec'y Opp'n at 11-12.  Although the Court does not agree with the exact rationale offered by the Secretary in support of abstention,[16] it agrees with him that Younger abstention might be appropriate in this case.  Alternatively, the Court would be inclined to dismiss this case under the Supreme Court's ruling in Colo. River Water Conservation Dist. v. United States, 424 U.S. 800 (1976) ("Colorado River").

---

[15](...continued)
"to decline to exercise its jurisdiction when it is asked to employ its historic powers as a court of equity." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 717 (D.C. Cir. 1996) (internal quotations omitted).  But "[t]hough [the Supreme Court] ha[s] thus located the power to abstain in the historic discretion exercised by federal courts sitting in equity, . . . the authority of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or deny relief."  Id. at 718 (internal quotation omitted).

[16]  The Secretary quotes Dist. Props. Assocs. v. District of Columbia, 743 F.2d 21 (D.C. Cir. 1984), for the proposition that "[f]ederal equitable intervention is not warranted if the federal plaintiff can secure a full and fair day in court on his constitutional claims by raising them by way of defense in a state enforcement proceeding which is already underway or is imminent anyway."  Sec'y Opp'n at 11-12 (quoting Dist. Props. Assocs., 743 F.2d at 27). This observation might be relevant if the plaintiff's Eighth Amendment claims could be used in some way as a defense against the criminal proceedings now on appeal to the High Court, but they cannot and have not been raised in that manner.  As best the Court can tell, both the Secretary and the American Samoa Defendants labor under the mistaken impression that the plaintiff still seeks a writ of habeas corpus.  See Sec'y Opp'n at 7 (arguing that the plaintiff must exhaust the appeal of his criminal conviction before seeking relief from this Court); id. at 12-13 ("a federal court should not interfere in criminal proceedings that have been initiated but not yet resolved in state or territorial court"); Am. Samoa Opp'n at 5 ("Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies" (quoting Baldwin v. Reese, 541 U.S. 27, 29 (2004) (internal quotation omitted))). The Court has already concluded, however, that the plaintiff's petition for a writ of habeas corpus had to be dismissed.  See Dismissal Order at 5 ("the [plaintiff's] petition for a writ of habeas corpus must be dismissed without prejudice for failure to exhaust his territorial remedies"); Reconsideration Order at 6 ("the Court will reinstate the [plaintiff's] non-habeas claims, but only to the extent that, through those claims, the petitioner seeks relief that is not contingent upon, and does not otherwise entail, his being released from incarceration" (emphasis added)).

In Younger, John Harris, Jr., a criminal defendant charged with violating the California

Criminal Syndicalism Act, Cal. Penal Code §§ 11400-11401 (repealed 1991), "filed a complaint

in the Federal District Court [for the Central District of California] asking that court to

enjoin . . . Younger, the District Attorney of Los Angeles County, from prosecuting him."

Younger, 401 U.S. at 36, 38-39.  Members of the Progressive Labor Party and a history professor

at Los Angeles Valley College intervened, arguing that Younger's prosecution of Harris chilled

their "rights of free speech and press."  Id. at 39-40.  A three-judge district court panel convened

pursuant to 28 U.S.C. § 2284 "held that [California's] Criminal Syndicalism Act was void for

vagueness and overbreadth in violation of the First and Fourteenth Amendments, and accordingly

restrained [Younger] from further prosecution of the currently pending action against plaintiff

Harris for alleged violation of the Act."  Id. (internal quotation omitted).

The Supreme Court reversed the district court, concluding that the district court's ruling

amounted to "a violation of the national policy forbidding federal courts to stay or enjoin pending

state court proceedings except under special circumstances."  Id. at 41.  Among "[t]he precise

reasons for this longstanding public policy" noted by the Supreme Court were "the basic doctrine

of equity jurisprudence that courts of equity should not act . . . when the moving party has an

adequate remedy at law and will not suffer irreparable injury if denied equitable relief," id. at 43-

44, and "the notion of 'comity,' that is, a proper respect for state functions," id. at 44.  Because

"a proceeding was already pending in the state court" at the time of Harris's suit "affording

Harris an opportunity to raise his constitutional claims," and because there was no suggestion

that Younger's suit was brought in "bad faith," the Supreme Court concluded that Harris was

"not entitled to equitable relief even if [the challenged] statutes [were] unconstitutional." Id. at 49 (internal quotation omitted).

Subsequent decisions by the Supreme Court "have extended Younger abstention into the civil context." Ankenbrandt v. Richards, 504 U.S. 689, 705 (1992) (collecting cases). Nevertheless, the broad contours of the doctrine remain the same in either milieu. See Hoai v. Sun Refining and Mktg. Co., Inc., 866 F.2d 1515, 1517 (D.C. Cir. 1989) ("a federal court may dismiss an action when there is a direct conflict between the exercise of federal and state jurisdiction and considerations of comity and federalism dictate that the federal court should defer to the state proceedings"). The District of Columbia Circuit has invoked a "rigid three-prong test" to determine whether the criteria for Younger abstention have been met: "first, . . . there [must be] ongoing state proceedings that are judicial in nature; second, the state proceedings must implicate important state interests; [and] third, the proceedings must afford an adequate opportunity in which to raise the federal claims." Bridges v. Kelly, 84 F.3d 470, 476 (D.C. Cir. 1996) (internal quotation omitted) (citing Hoai, 866 F.2d at 1518 (citing Middlsex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982))).

The first and second criteria are satisfied in this case. The plaintiff has already sought relief from the High Court of American Samoa as a matter ancillary to his criminal appeal. Am. Compl. ¶¶ 31-32, 34; Seitz Aff. ¶¶ 6-7, 9, Ex. B (Defendant-Appellant's Motion for Emergency Release) (the "Pl. Emergency Mot."); High Court Order at 1-2; Hales Aff. ¶¶ 3-5, 7. That proceeding, including the High Court's review of the plaintiff's medical condition and the adequacy of the care and treatment provided to him, are still ongoing. Am. Compl. ¶ 21 (alleging that "[the p]laintiff's appeal to the Appellate Division of the High Court was argued and taken

40

under submission on July 10, 2007"); High Court Order at 2-3 (requiring Attorney General Ripley to "submit to the Governor, Commissioner of Public Safety, Warden of the Correctional Facility, and th[e High] Court a written report of [Attorney General Ripley's] investigation results, which shall include his recommendations on the proper course of action to resolve this matter"). The plaintiff's suit in this Court necessarily intrudes on the High Court's investigation into this matter.

Moreover, the proceedings before the High Court plainly implicate important interests of the American Samoa government. The plaintiff has appealed his multiple convictions for, <u>inter alia</u>, murder in the first degree, which led to the imposition of a sentence of life imprisonment. Am. Compl. ¶ 19. He alleges that numerous members of the executive branch of the American Samoa government, as well as the LBJ Center, "an independent agency of the American Samoa [g]overnment and . . . the only medical facility" where prisoners like the plaintiff "can receive medical care and treatment in American Samoa," have refused to provide adequate medical care to the plaintiff in derogation of both the United States and the American Samoa Revised Constitution. Am. Compl. ¶¶ 6-12, 43-48. His suit in this Court potentially impacts the criminal proceeding that brought about his detention and implicates the American Samoa government itself insofar as the plaintiff suggests that the LBJ Center, as an agency of that government, will not arrange for him to receive adequate medical care.

The third requirement for <u>Younger</u> abstention – that the state proceeding "afford an adequate opportunity" for the plaintiff to raise his "federal claims," <u>Bridges</u>, 84 F.3d at 476 (internal quotation omitted) – is not so easily satisfied. The High Court has directed Attorney General Ripley to "set in motion appropriate action" with respect to the plaintiff's claims of

inadequate medical care and treatment, High Court Order at 1, and will review Attorney General

Ripley's assessment of the situation in due course, id. at 1-2, but it cannot award damages to the

plaintiff under § 1983 or Bivens in the course of resolving a matter ancillary to a criminal

proceeding.  Thus, while the High Court arguably has provided an "adequate forum" for the

plaintiff to present his constitutional grievances, it may not provide the plaintiff the relief

afforded under either § 1983 or Bivens.

Nevertheless, the Court would likely dismiss this case under the so-called "Colorado

River doctrine" even if it concluded that Younger abstention did not apply.  In Colorado River,

the United States sought declaratory relief in the District Court for the District of Colorado

against "some 1,000 water users" regarding water rights in certain rivers and their tributaries

located approximately 300 miles away from the district court.  Colorado River, 424 U.S. at 806.

"Shortly after the federal suit was commenced, one of the defendants in that suit filed an

application in the state court for [one of the State's seven Water Divisions] seeking an

order . . . to make [the United States] a party to proceedings [in that Water Division] for the

purposes of adjudicating all of the [g]overnment's claims, both state and federal." Id. at 806.  In

response to a subsequent motion to dismiss filed by several defendants and intervenors in the

federal court lawsuit, the district court dismissed the federal case on abstention grounds, only to

be reversed by the Tenth Circuit.  Id.

The Supreme Court reversed the Tenth Circuit's decision.  Id. at 821.  Although it agreed

with the Tenth Circuit that "this case f[ell] within none of the abstention categories," the

Supreme Court held that the district court correctly dismissed the case based on "considerations

of wise judicial administration, giving regard to conservation of judicial resources and

comprehensive disposition of litigation." Id. at 817 (internal quotation omitted).  While

recognizing that federal courts have a "virtually unflagging obligation . . . to exercise the

jurisdiction given to them," id., the Supreme Court noted that "circumstances permitting the

dismissal of a federal suit due to the presence of a concurrent state proceeding . . . , though

exceptional, do nevertheless exist," id. at 818.  The Supreme Court counseled that courts may

"consider such factors as the inconvenience of the federal forum . . . ; the desirability of avoiding

piecemeal litigation . . . ; and the order in which jurisdiction was obtained by the concurrent

forums" in determining whether such circumstances exist in a particular case, id. at 818, but

cautioned that courts must "tak[e] into account both the obligation to exercise jurisdiction and

the combination of factors counsel[]ing against that exercise," id., and that "[o]nly the clearest of

justifications will warrant dismissal," id. at 819.

 The Supreme Court refined its Colorado River analysis in Moses H. Cone Mem'l Hosp.

v. Mercury Constr. Corp., 460 U.S. 1 (1983) ("Moses H. Cone").  In that case, Moses H. Cone

Memorial Hospital (the "Hospital") and Mercury Construction Corporation ("Mercury") entered

into a construction contract providing, inter alia, that contractual disputes between them would

be resolved in the first instance by the architect for the parties' construction project and

submitted to binding arbitration in the event that one party did not agree with the architect's

decision.  Id. at 4-5.  At the architect's request, Mercury agreed to withhold certain "claims for

extended overhead or increase in construction costs due to delay or inaction by the Hospital[]

until [its] work was substantially completed."  Id. at 6.  When Mercury submitted its claims in

January of 1980, the Hospital refused to pay them, id. at 6, and instead filed an action in North

Carolina state court seeking declaratory relief and, one week later, an ex parte motion for a preliminary injunction, which the state court granted, id. at 7.

Once the injunction was dissolved, Mercury filed an action in the United States District Court for the Middle District of North Carolina "seeking an order compelling arbitration under § 4 of the Arbitration Act, 9 U.S.C. § 4." Id. The district court stayed the case before it pending resolution of the state court suit "because the two suits involved the identical issue of the arbitrability of Mercury's claims." Id. The Fourth Circuit "reversed the [d]istrict [c]ourt's stay order and remanded the case to the [d]istrict [c]ourt with instructions for entry of an order to arbitrate." Id. at 8.

The Supreme Court affirmed the Fourth Circuit's decision in all respects. Id. at 29. In so doing, the Supreme Court reiterated its sentiment from Colorado River that "the decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they can apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." Id. at 16. The Court emphasized that "[b]y far the most important factor" in its Colorado River analysis "was the clear federal policy of avoidance of piecemeal adjudication of water rights in a river system," and "that other factors in the case tended to support dismissal;" namely, "the absence of any substantial progress in the federal-court litigation; the presence in the suit of extensive rights governed by state law; the geographical inconvenience of the federal forum; and the Government's previous willingness to litigate similar suits in state court." Id. The Supreme Court added that another factor that should be considered based on the Court's earlier ruling in Will v. Calvert Fire Ins.

44

Co., 437 U.S. 655 (1978) ("Calvert"), is whether "federal law provides the rule of decision on the

merits." Moses H. Cone, 460 U.S. at 23 (citing Calvert, 437 U.S. at 667).[17]

    Applying the Colorado River factors (as modified by the Supreme Court in Moses H.

Cone) to this case, the Court concludes that it would likely dismiss this case even if the Younger

abstention doctrine does not apply.  Although the plaintiff's first cause of action is raised under

§ 1983, he also alleges "that [the d]efendants failed and/or refused to exercise the degree of care

or skill ordinarily exercised by others of their profession in failing to provide medical care and

treatment for [the p]laintiff's serious medical needs and conditions," Am. Compl. ¶ 47; i.e.,

engaged in medical malpractice.  This is a non-federal cause of action that would normally be

raised in the courts of American Samoa.  Moreover, the plaintiff has already requested injunctive

relief from the High Court for the exact same injury alleged by the plaintiff in this lawsuit, Pl.

Emergency Mot. at 1-2, and the High Court has initiated a process for determining the validity of

the plaintiff's allegations in an expeditious manner.  High Court Order at 2-3.  Nor has the

---

    [17] In Calvert, the Seventh Circuit "granted a petition for writ of mandamus ordering . . . a [district court] judge . . . to proceed immediately to adjudicate a claim based upon the Securities Exchange Act of 1934 . . . despite the pendency of a substantially identical proceeding between the same parties in the Illinois state courts." Calvert, 437 U.S. at 657.  "The key" to the case "was the standard for issuance of a writ of mandamus under 28 U.S.C. § 1651." Moses H. Cone, 460 U.S. at 18.  The propriety of the writ's issuance turned on whether the district court's decision to stay the case was a "clear and indisputable" violation of Colorado River. Id. at 16-18.
    Writing for himself and three other members of the Supreme Court, then-Justice Rehnquist concluded that the decision to stay the case by the district court was not a "clear and indisputable" error because "[t]he decision in such circumstances is largely committed to the discretion of the district court" and "Colorado River . . . established that such deference may be equally appropriate even when matters of substantive federal law are involved in the case." Calvert, 437 U.S. at 664.  Four members of the Court dissented from this view, concluding that the district court's stay order "was impermissible under Colorado River." Moses H. Cone, 460 U.S. at 17 (citing Calvert, 437 U.S. at 668-69, 672-74).  Justice Blackmun concurred in the judgment reached by Justice Rehnquist's plurality opinion, but "agreed with the dissent that Colorado River's exceptional-circumstances test was controlling," and accordingly "voted to remand to permit the [d]istrict [c]ourt to apply the Colorado River factors in the first instance." Id. (citing Calvert, 437 U.S. at 667-68).  Justice Blackmun also joined the dissent in "point[ing] out that the case involved issues of federal law." Id. (citing Calvert, 437 U.S. at 667-68).  Because Justice Blackmun's observations in concurrence with the four dissenting members of the Supreme Court constituted a majority for purposes of that specific point of law, the Moses H. Cone Court recognized the prominence of federal law as another factor "that emerges from Calvert." Id.

plaintiff made any "progress" in his suit before this Court. Finally, the Court can hardly conceive

of a forum less convenient for those defendants residing in American Samoa than Washington,

D.C., "thousands of miles and seven hours" ahead of the South Pacific island. Am. Samoa

Opp'n at 4.

In short, this case presents exactly the type of "exceptional circumstances" recognized in

Colorado River as an appropriate basis for the Court to decline the exercise of its jurisdiction.

Colorado River, 424 U.S. at 813. The Court recognizes "that federal courts have a strict duty to

exercise the jurisdiction that is conferred upon them by Congress," Quackenbush v. Allstate Ins.

Co., 517 U.S. 706, 716 (1996), but where, as here, the plaintiff has already raised his

constitutional grievances in the forum best suited to adjudicate them, and where, as here, further

proceedings before this Court would interfere with pre-existent and ongoing territorial

proceedings and would create a severe and unfair inconvenience for the vast majority of the

defendants, dismissal under the Colorado River doctrine is appropriate.

4.    Summary

To summarize, the Court appears to lack personal jurisdiction over all of the American

Samoa and LBJ Center Defendants except Hales, and the plaintiff has not alleged a breach of

duty, much less a breach of duty amounting to the infliction of cruel and unusual punishment, by

Hales or any of the other American Samoa Defendants. In addition, the plaintiff cannot sue the

Secretary in his official capacity under § 1983 or Bivens, and has not alleged facts sufficient to

warrant a writ of mandamus under § 1651(a). Moreover, this case should be dismissed in any

event under either the Younger abstention doctrine or the Supreme Court's ruling in Colorado

<u>River</u>.  For all these reasons, the Court concludes that the plaintiff has almost no chance of

succeeding on the merits of his claims.

B.    <u>Irreparable Injury</u>

The second prong of the Court's required four-prong analysis asks whether the plaintiff

can demonstrate that he will endure irreparable injury should his request for preliminary

injunctive relief be denied.  To qualify, the plaintiff's injury "must be both certain and great; it

must be actual and not theoretical."  <u>Wisc. Gas Go. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985)

(per curiam).  The alleged injury must be "of such <u>imminence</u> that there is a 'clear and present'

need for equitable relief to prevent irreparable harm."  <u>Id.</u> (internal quotation and citations

omitted) (emphasis in original).  Finally, "the injury must be beyond remediation" to warrant

preliminary injunctive relief.  <u>Chaplaincy of Full Gospel Churches</u>, 454 F.3d at 297.

The evidence adduced by the plaintiff in support of his renewed motion does not meet

this "high standard for irreparable injury."  <u>Id.</u>  The original basis for the plaintiff's requested

relief is the Saleapaga Letter, which, according to the plaintiff, recommends transfer of the

plaintiff off the island of American Samoa for a full medical evaluation and treatment.  As the

Court previously explained in its Reconsideration Order,

> [T]he letter of the [plaintiff]'s physician . . . states that the [plaintiff]
> has suffered from his condition for almost twenty years, Saleapaga
> Letter at 1, and does not represent that the [plaintiff's] situation has
> so changed recently as to require immediate and urgent care without
> the [defendants] having had the chance to weigh in.  Indeed, while the
> [plaintiff]'s physician states that the [plaintiff] requires evaluation
> and treatment that can only be provided to him off the island of
> American Samoa, he does not couch this diagnosis in any terms of
> urgency whatsoever.  <u>Id.</u> at 2 (stating only that "[t]his patient needs
> neurology evaluation to include EEG, MRI, and maybe Angiograthy.
> He   also   needs   cardiology   evaluation   which   may   include

Echocardiogram, Holter monitor, and maybe cardiac catheterization.").

Reconsideration Order at 6 n.4.

Dr. Saleapaga has since clarified his position with respect to the potential dangers faced by the plaintiff if he is not transferred off-island. In a declaration submitted in support of the American Samoa Defendants' motion for sanctions, he states that "[the plaintiff's] complaints of pain are subjective," Am. Samoa Sanctions Mot., Ex. C (Sworn Affidavit of Iotamo T. Saleapaga, M.D.) (the "Saleapaga Affidavit") ¶ 5, that "[the plaintiff's] medical condition was not life threatening and he was not an appropriate candidate for referral to the Off-Island Referral Committee" at the time of his examination, id. ¶ 7, and that his earlier letter on behalf of the plaintiff "was never intended as a referral to the Off-Island Referral Committee and should not be misconstrued as such," id. Instead, Dr. Saleapaga now states that he prepared his earlier letter on the plaintiff's behalf because the plaintiff's attorney in American Samoa "requested that I prepare a letter explaining [the plaintiff]'s medical condition and emphasiz[ing] the benefits he could enjoy by residing where more sophisticated medical care is available." Id. ¶ 3. Given this sworn submission from Dr. Saleapaga, the Court cannot infer, much less conclude by a preponderance of the evidence, that anything in the Saleapaga Letter establishes an injury "both certain and great." Wisc. Gas Go., 758 F.2d at 674.

Nor can the Court infer any imminent threat to the plaintiff based on the affidavit of Dr. Irwin J. Schatz. Dr. Schatz, a medical professor at the University of Hawaii, states in an affidavit in support of the plaintiff's renewed motion that "the recommendations of Dr. Saleapaga should be followed immediately . . . due to the seriousness of [the plaintiff's] reported

symptoms."  Pl. Mem., Ex. K (Affidavit of Irwin J. Schatz, M.D.) ¶¶ 2, 6-7.  Dr. Schatz has not

"met or examined [the plaintiff]," or even "met or spoken to Dr. Saleapaga," id. ¶ 4, and

therefore has no firsthand basis for rendering any medical conclusions about the plaintiff

whatsoever.  But even if everything Dr. Schatz indicates in his affidavit is correct, his

recommendations, which are intended to "diagnose . . . or rule out potentially life threatening"

conditions, id. ¶ 7 (emphasis added), do not in any way indicate that the plaintiff will suffer

"actual" harm if he is not transferred immediately to a medical facility with the testing equipment

listed by Dr. Saleapaga in his letter.  Wisc. Gas Go., 758 F.2d at 674.

    Similarly, the representation by the plaintiff's attorney in his reply affidavit that he is

"prepared to provide testimony by competent board[-]certified medical experts that when

presented with the symptoms attributed to [the plaintiff] it is incumbent upon any physician to

perform adequate tests to confirm or rule out the more serious potential causes of those

symptoms," Seitz Reply Aff. ¶ 8, does nothing to establish the existence of an actual, imminent

harm to the plaintiff that can only be prevented by preliminary injunctive relief.  Even if the

Court were to take the plaintiff's attorney's proffered representations at face value as testimony,

the most it would establish is that "it is incumbent upon any physician to perform adequate tests

to confirm or rule out the more serious potential causes of those symptoms and that the failure to

do so constitutes medical malpractice and the denial of minimally required medical care."  Id.

Such testimony might be helpful in a medical malpractice suit against the LBJ Center prosecuted

in American Samoa, but it does nothing to establish that the plaintiff will suffer irreparable injury

absent a preliminary injunction by this Court.

The plaintiff has submitted no evidence whatsoever that he will suffer imminent harm if his renewed motion for preliminary injunctive relief is not granted. His renewed motion must therefore be denied for this reason alone.

C.    Harm to Other Parties

The third factor for the Court to consider in weighing the merits of the plaintiff's renewed motion for preliminary injunctive relief is the extent to which a preliminary injunction would "substantially injure other parties." Cityfed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995). Without question, a preliminary injunction directing any of the defendants to transfer the plaintiff off-island (or, in the case of the Secretary, directing him to fund such a transfer) would harm these defendants insofar as they would have to pay for that transfer, along with any other expenses associated with the transfer. Injunctive relief against the LBJ Center might be particularly harmful given the assertions of the plaintiff's attorney that the hospital has no funds available for off-island transportation. See n.7, supra. Thus, this prong of the preliminary injunction test weighs against the issuance of an injunction as well.

D.    Public Interest

Finally, the public interest would not be served if the plaintiff's request for preliminary injunctive relief were granted for several reasons. First, "it is in the public interest to deny injunctive relief when the relief is not likely deserved under law." Hubbard v. United States, 496 F. Supp. 2d 194, 203 (D.D.C. 2007) (quoting Qualls v. Rumsfeld, 357 F. Supp. 2d 274, 287 (D.D.C. 2005)); see also Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1326 (D.C. Cir. 1998) ("The final preliminary injunction factor, the public interest, . . . is inextricably linked with the

merits of the case."). As the Court has explained in some detail above, the plaintiff will almost certainly not succeed on the merits of his case. See part III.A, supra.

Second, "[t]he usual rule of a preliminary injunction is to preserve the status quo pending the outcome of litigation." Cobell v. Kempthorne, 455 F.3d 301, 314 (D.C. Cir. 2006) (quotation omitted). Here, the plaintiff seeks to upset the status quo by having the Court provide the ultimate relief sought by the plaintiff at the very outset of the case. Given the difficulties faced by the defendants (except for the Secretary) to make appearances before this Court due to the distance between the Court and American Samoa, it would be especially inequitable to enter what would amount to an interim judgment in favor of the plaintiff.

Finally, the Court cannot ignore the implications of the plaintiff's suit for the American Samoa government. The plaintiff has been convicted of some of the most serious crimes imaginable and has been sentenced to life imprisonment by the courts of American Samoa, an island territory half a world away with its own constitution, civil and criminal code, and governmental structure. Neither he nor any of the defendants actually responsible for his daily medical care have any connection whatsoever to the District of Columbia. To intrude upon the parallel proceedings before the territory's High Court – initiated, it bears repeating, by the plaintiff himself – and whisk the defendant away to an altogether different jurisdiction for an indeterminate amount of time would be so severe an offense to traditional notions of comity as to warrant dismissal of this case altogether. See part III.A.3, supra. These same principles argue even more strongly against granting such relief by way of a preliminary injunction.

## IV. Conclusion

"It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, <u>by a clear showing</u>, carries the burden of persuasion." <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, at 129-130 (2d ed.1995)) (emphasis supplied and footnotes omitted by the Supreme Court in <u>Mazurek</u>).  The plaintiff in this case has not carried his burden of persuasion with respect to any of the four factors that the Court must consider in evaluating the propriety of his request.  His renewed motion for injunctive relief must therefore be denied.

Additionally, the Court has serious concerns about the viability of the plaintiff's case given the substantive flaws in the plaintiff's case described above.  Under the circumstances, the Court would be remiss not to ascertain on its own accord whether the plaintiff's Amended Complaint states a claim for which relief can be granted and, if necessary, whether the Court should dismiss this case under the <u>Younger</u> abstention doctrine or the <u>Colorado River</u> doctrine. The Court will therefore enter an order to show cause why it should not dismiss the Amended Complaint in its entirety based on the Court's discussion of the plaintiff's likelihood of success on the merits of his case.  Because the various arguments for dismissal advanced by the Secretary and Hales are effectively moot in light of the Court's order to show cause, the Court will deny the motions to dismiss filed by those defendants without prejudice.  Instead, the Court will grant

the defendants leave to respond to any papers filed by the plaintiff in reply to the order to show cause.[18]

      **SO ORDERED** this 30th day of October, 2007.[19]


                                       REGGIE B. WALTON
                                       United States District Judge

---

[18]  The Court will also deny the sanctions motions filed by the LBJ Center Defendants and Hales on ripeness grounds in light of the Court's contemporaneously entered order to show cause.  If the Court determines that the Amended Complaint should be dismissed in its entirety, these defendants may renew their sanctions motions at that time if they so desire.

[19]  A separate order denying the plaintiff's renewed motion for a preliminary injunction follows.